### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

```
----------------------------------------------------------- x
                                            :
In re:                                      :    Chapter 15
                                            :
ESSAR STEEL ALGOMA INC., et al.,¹           :    Case No. 15– _____ (    )
                                            :
                                            :
            Debtors.                        :    (Joint Administration Requested)
                                            :
----------------------------------------------------------- x
```

### DECLARATION OF J. ROBERT SANDOVAL IN SUPPORT OF
### (I) VERIFIED CHAPTER 15 PETITIONS; (II) FOREIGN REPRESENTATIVE'S
### MOTION FOR ORDERS GRANTING PROVISIONAL AND FINAL RELIEF IN AID
### OF FOREIGN MAIN PROCEEDING; AND (III) CERTAIN RELATED RELIEF

I, J. Robert Sandoval, hereby submit this declaration (the "**Declaration**") and state as follows:

1.      I am the General Counsel of Essar Steel Algoma Inc. ("**Algoma Canada**"), the authorized foreign representative (the "**Foreign Representative**") of the above-captioned debtors (collectively, "**Algoma**" or the "**Debtors**") who have filed an application in a foreign proceeding (the "**CCAA Proceeding**") under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**") pending before the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**").

2.      On November 9, 2015, the Canadian Court entered the initial order, a copy of which is attached hereto as **Exhibit A** (the "**CCAA Initial Order**"), which, among other things, appointed Algoma Canada as the "foreign representative" of the Debtors.

---

¹ The Debtors in these chapter 15 cases and the last four digits of each Debtor's United States Tax Identification Number, Canadian Business Number, or Provincial Corporation Number, as applicable, are as follows: Essar Steel Algoma Inc. (0642), Essar Steel Algoma Inc. USA (8788), Essar Steel Algoma (Alberta) ULC (6883), Essar Tech Algoma Inc. (8811), and Cannelton Iron Ore Company (9965). The Debtors' principal offices are located at 105 West Street, Sault Ste. Marie, Ontario P6A 7B4, Canada.

3.      I submit this Declaration in support of the following motions and other documents submitted by the Foreign Representative concurrently herewith (collectively, the "**First Day Pleadings**"):  (a) the verified chapter 15 petitions of the Debtors; (b) the *Motion of Foreign Representative for Entry of Provisional and Final Orders Granting Recognition of Foreign Main Proceeding and Certain Related Relief Pursuant to Sections 362, 364(e), 365, 1517, 1519, 1520, 1521, and 105(a) of Bankruptcy Code* (the "**Recognition and Relief Motion**"); (c) the *Memorandum of Law of Foreign Representative in Support of (I) Verified Chapter 15 Petitions and (II) Motion of Foreign Representative for Orders Granting Provisional and Final Relief in Aid of Foreign Main Proceeding* (the "**Memorandum of Law**"); (d) the *Motion of Foreign Representative for Entry of Order Authorizing Joint Administration of Debtors' Chapter 15 Cases Pursuant to Bankruptcy Rule 1015(b)* (the "**Joint Administration Motion**"); (e) the *Motion of Foreign Representative for Entry of Order Authorizing Filing of a Consolidated List of Foreign Proceeding Administrators, Litigation Parties, and Entities Against Whom Provisional Relief is Sought Pursuant to Section 105(a) of Bankruptcy Code and Bankruptcy Rule 1007(a)(4)* (the "**Consolidated Lists Motion**"); and (f) the *Motion of Foreign Representative for Entry of Order Scheduling Hearing and Specifying Form and Manner of Service of Notice Pursuant to Sections 1515 and 105(a) of Bankruptcy Code and Bankruptcy Rules 2002 and 9007* (the "**Notice Procedures Motion**").  I am authorized by the Debtors to submit this Declaration on their behalf in support of the First Day Pleadings.

4.      In my role as General Counsel of Algoma Canada, I have become familiar with Algoma's business, day-to-day operations, and financial affairs, and I have been closely involved in the Debtors' financing and restructuring efforts to date.  I am an individual over the age of 18 and, if called upon, could and would testify to the facts set forth in this Declaration.  Except as

otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge,

information supplied to me by other members of Algoma's management and professionals,

learned from my review of relevant documents, or my opinion based upon my experience and

knowledge of the Debtors' industry, operations, and financial condition.

## I.     OVERVIEW

5.     Algoma operates one of the largest integrated steel manufacturing facilities in

Canada, producing high-quality steel and steel products for customers throughout North

America.  A little over one year ago, Algoma was before this Court and the Canadian Court to

implement a targeted debt restructuring (the "**2014 Restructuring**").  As described in more

detail below, leading up to the 2014 Restructuring, Algoma was plagued by multi-year losses

resulting from (i) the economic downturn in 2008 and 2009, which had caused decreased steel

demand and pricing, (ii) severe weather disruptions that resulted in shipment delays and reduced

production, (iii) unfavorable raw material pricing, and (iv) pension liabilities.  Although at the

time of the commencement of the 2014 Restructuring, Algoma expected its financial

performance to improve based on resolution of many of these conditions – including positive

movement in the steel market, a renegotiation of its key iron ore supply agreement with more

competitive pricing, and implementation of a pension plan payment schedule – Algoma still

faced an immediate need to restructure its debt obligations.  Algoma's then-current level of debt

obligations and annual interest expense were unsustainable.  Algoma retained restructuring

advisors and, together with its advisors, negotiated a consensual restructuring arrangement.

6.     Pursuant to the 2014 Restructuring, Algoma refinanced its secured credit facilities

and secured and unsecured notes, and received an equity infusion from its ultimate parent entity.

Algoma effectuated the 2014 Restructuring through a plan of arrangement implemented in (i) a

proceeding under section 192 of the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44, as

amended, before the Canadian Court (the "**CBCA Proceeding**"), and (ii) corollary cases commenced by Algoma Canada (as the foreign representative) under chapter 15 of title 11 of the United States Code (the "**Bankruptcy Code**") before this Court, pursuant to which this Court recognized the CBCA Proceeding as a foreign main proceeding (and that Algoma's center of main interests is in Canada).  Algoma emerged from these proceedings with an improved balance sheet, additional equity, and the expectation that, with reduced debt service obligations and better economic and market conditions, its financial performance would substantially improve.

7.      Unfortunately, in the short period of time since the 2014 Restructuring went effective, market conditions have continued to deteriorate.  The price of steel has continued to drop as a result of oversupply in the market, causing a corresponding decline in Algoma's earnings.  Notwithstanding Algoma's efforts to reduce costs, this environment has placed significant pressure on its ability to service debt and other expenses, and Algoma no longer is able to comply with a financial covenant in its secured term loan agreement.  Faced with this situation, over the summer months of 2015 Algoma explored different asset monetization and refinancing options, but was unable to close a transaction.

8.      At the same time, since early 2015, Algoma has been engaged in litigation with The Cleveland-Cliffs Iron Company, Cliffs Mining Company, and Northshore Mining Company (collectively, "**Cliffs**"), its longstanding, exclusive supplier of iron ore pellets – an essential raw material input in the steel making process.  The litigation centers on a damages dispute over Algoma's alleged breach of the Cliffs supply agreement and counterclaims based on (among other things) Cliffs' failure to properly apply certain payments made by Algoma and Cliffs' attempt to overcharge for certain shipments.  Notwithstanding the pendency of this litigation

over potential damages, the parties continued doing business with one another, as they had for

over ten years, with Cliffs providing Algoma with its sole and essential supply of iron ore pellets.

9.       In early October 2015, without any basis in the law or contract, and with no

notice, Cliffs purported to terminate its exclusive supply agreement and immediately ceased

providing Algoma with iron ore.  Cliffs' actions forced Algoma to scramble to seek an

emergency, near-term pellet supply from alternate sources at significantly increased prices

compared to the Cliffs agreement.  This placed Algoma in an untenable financial and operational

situation, particularly in light of the upcoming winter months, which put significant strain on

Algoma's ability to receive the iron ore supply necessary to maintain production capacity at the

level required to avoid equipment failure and ultimately, permanent shutdown.

10.       In light of the foregoing, Algoma engaged restructuring advisors.  Algoma

retained Weil, Gotshal & Manges LLP, as United States (the "**U.S.**") restructuring counsel,

Stikeman Elliott LLP, as Canadian restructuring counsel, Evercore Group L.L.C. ("**Evercore**"),

as investment banker, and Ernst & Young, as financial advisor[2] (collectively, the

"**Restructuring Advisors**"), to assess Algoma's options for implementing immediate measures

to protect the value of the company and its assets, provide access to necessary liquidity, and

secure a stable and affordable ongoing supply of iron ore pellets, while giving Algoma

"breathing room" to explore alternatives for a comprehensive restructuring.  The Restructuring

Advisors worked expeditiously with Algoma over the past few weeks to assess Algoma's

financing options and potential strategies.  Ultimately, Algoma and its Restructuring Advisors

determined that, given the exigent circumstances, Algoma was left no choice but to seek

protection in the U.S. and Canada from actions by creditors, to preserve and maximize the value

---

[2] Pursuant to the CCAA Initial Order, Ernst & Young was appointed Monitor in the CCAA Proceeding.

of its assets for the benefit of all stakeholders.  Accordingly, Algoma commenced the CCAA Proceeding and these chapter 15 cases.

11.    As described in further detail below, prior to the commencement of these chapter 15 cases, after discussions with multiple parties, Algoma and its Restructuring Advisors negotiated a $200 million debtor-in-possession financing facility with Deutsche Bank AG New York Branch ("**Deutsche Bank**"), on behalf of itself and other prepetition secured lenders (the "**DIP Lenders**") to Algoma, which will provide Algoma with necessary liquidity to fund ongoing operations and expenses associated with the CCAA Proceeding and these chapter 15 cases.  Algoma was experiencing a severe liquidity crisis that threatened to strangle the company.  With the liquidity from the debtor-in-possession financing in place, and with the benefit of the relief sought including, the application of the automatic stay and section 365 of the Bankruptcy Code, Algoma and its Restructuring Advisors will be able to focus on (a) stabilizing the business, (b) securing Algoma's long-term pellet supply, and then (c) expeditiously developing and negotiating with creditors a comprehensive and consensual restructuring that will enable Algoma to quickly emerge from the CCAA Proceeding and these chapter 15 cases and continue operating as a going concern.

## II.    ALGOMA'S BUSINESS

12.    Algoma's headquarters and steel manufacturing facilities are in Sault Ste. Marie, Ontario, Canada, but a substantial number of its customers and suppliers are located in the U.S. and it employs six sales representatives in the U.S in a number of states.  For the fiscal year ended March 31, 2015, approximately 50% of Algoma's steel products were sold to customers located in the U.S., and the other 50% to customers located in Canada.  Approximately half of the customers purchase steel pursuant to one year contracts, and the rest are spot sales on the market.

13.     Algoma primarily manufactures two types of products, sheet and strip steel and plate steel, which Algoma markets and sells directly to end users or to steel service centers who distribute them to buyers in the automotive, construction, and heavy equipment markets. Algoma has a long history, dating back to the early 1900s, and has since grown to a fully integrated steel producer, with a diverse customer base.  It now operates as the second largest integrated steel producer in Canada by capacity and finished product shipments.

### A.     Algoma's History and Operations

14.     Algoma was founded in 1901 by an American industrialist, Francis H. Clergue, and the company has a history of leadership in the industry.  Algoma began by casting liquid steel into ingots and rolling it into rails for railroad expansion across Canada.  The company then grew into an integrated steel mill and, in 1959, was one of the first steelworks in North America to commission a basic oxygen furnace.  In 1995, Algoma invested $450 million into the construction of its direct strip production complex, the world's first continuous casting complex.

15.     For the twelve months ended June 30, 2015, Algoma shipped approximately 2.5 million tons of steel products, which, together with non-steel sales, generated net sales of approximately $2 billion (CAD) and Adjusted EBITDA of approximately $188 million (CAD). Approximately 60% of Algoma's customers are located within a 500-mile radius in the key steel consuming regions of the U.S. Midwest, U.S. Northeast, and southern Ontario, allowing Algoma to service customers at competitive costs.

16.     Algoma's steelworks operations and head office are located at its 1,700-acre site located in the hub of the Great Lakes region in Sault Ste. Marie, Ontario, Canada.  The facility is adjacent to the St. Mary's River and is accessible by rail, road, and water.  Algoma also has sales offices in Burlington, Ontario and Calgary, Alberta in Canada, and a sales team in the U.S.

Algoma employs approximately 3,000 employees, including six in the U.S., and over 90% of its Canadian employees are represented by the United Steelworkers.

### B.    Steel Production

17.    Algoma is an integrated steelmaker — the company produces coke from coal, uses the coke to power furnaces that convert iron ore pellets to iron, converts the iron to liquid steel, and produces a broad range of high-quality semi-finished and finished products from the liquid steel.  Algoma's production facilities include:

- three coke batteries;
- two blast furnaces;
- basic oxygen steelmaking and refining facility;
- conventional slab caster;
- direct strip production complex;
- conventional combination hot rolling mill capable of switching between plate and sheet products;
- plate heat treat facilities and plate finishing facilities; and
- downstream facilities consisting of pickling, cold rolling, annealing and tempering, sheet slitting, cut to length, and blanking facilities.

The diagram below provides a high level overview of the steelmaking process:



### C.     Steel Products

18.     Algoma's rolling mills provide the flexibility to optimize product mix between sheet and plate products to meet changes in market demand and pricing.  Algoma sells a majority of its products to steel service centers who distribute to the automotive, construction, and heavy equipment markets.  In addition, Algoma markets and sells its products directly to customers in the automotive sector, the pipe and tube sector, the fabrication sector, and the manufacturing sector.

19.     Algoma produces sheet steel in a wide variety of widths and gauges of hot-rolled coil, cold-rolled coil, hot-rolled pickled and oiled products, floor plate, and cut-to-length product. The primary end-users of sheet steel are the automotive industry, hollow structural product manufacturers, and the light manufacturing and transportation industries.  For the last five years, sheet steel products have represented approximately 85% of total steel shipment volumes.

20.     Algoma produces plate steel in various grades of as-rolled, hot-rolled, and heat-treated plate.  The primary end-user of plate steel is the fabrication industry, which uses plate steel in the construction or manufacture of railcars, buildings, bridges, off-highway equipment, storage tanks, ships, armored products for military applications, large diameter pipelines and wind energy generation equipment.  For the last five years, plate steel products have represented approximately 15% of total steel shipment volumes.

21.     In contrast to many other steel manufacturers which produce steel in batches, Algoma is a continuous supply manufacturer.  The continuous production model means Algoma realizes lower production costs due to reduced manpower, heating costs, and reduced yield loss; however, this operational structure also means that a shutdown of operations, even if brief, has a significant negative effect on production.

### D.    Raw Materials and Energy

22.    Algoma's steelworks requires large quantities of several different raw materials for operation including, among others, iron ore pellets, coal, coke, limestone, alloys, and scrap. Approximately 60-70% of the Company's raw material suppliers are located in the U.S.

23.    The largest and most important input in the steel making process is iron ore. From January 2002 until mid-October 2015, all of the company's iron ore supply was purchased under a 23-year contract with Cliffs (the "**Cliffs Iron Ore Contract**").  Then, on October 5, 2015, Cliffs purported to terminate the Cliffs Iron Ore Contract with no notice to Algoma (as discussed in more detail below), and Algoma was forced to enter into short-term iron ore supply agreements with alternative suppliers on an emergency basis.  In addition, beginning in January 2017, Essar Steel Minnesota LLC, an affiliate of Algoma, will provide a supplementary supply of iron ore.

24.    There are several additional materials Algoma relies on for its steel making operations.  Algoma uses coal, which is carbonized in coke battery ovens to produce the majority of the company's coke requirements for its blast furnaces.  Algoma purchases coal from several suppliers in the U.S. and Canada, pursuant to annual contracts.  Some additional coke is purchased as required on the spot market.  Algoma also purchases limestone, alloys, and scrap metal at competitive prices pursuant to contracts with various suppliers and on the spot market. Algoma generates approximately half of its scrap requirements internally.

25.    Algoma's manufacturing operations run around the clock, and consume significant amounts of energy.  Algoma requires a regular supply of natural gas, which it purchases from independent suppliers at market pricing.  Algoma obtains approximately 50% of its electricity from the Independent Electricity System Operator (IESO) in Ontario at regulated

spot prices, and 50% from the Essar Cogeneration Facility, which is owned by Essar Power

Canada ("**EPC**") Ltd, an affiliate of Algoma.

26.     In 2009, EPC and Algoma entered into an arm's-length transaction, pursuant to

which Algoma provides EPC by-product gases (blast furnace gas and coke oven gas) from steel

production, which EPC uses at its cogeneration facility to produce electricity and processed

steam.  EPC provides Algoma with processed steam in exchange for the by-product gases, and

sells the electricity it produces to Algoma at the Hourly Ontario Electrical Price ("**HOEP**"), a

rate that is significantly lower than the market cost of electricity (as it does not include certain

significant adjustments).  IESO and EPC have an agreement pursuant to which IESO guarantees

payment to EPC payment of the difference between the HOEP and the contracted rate of

$100.06/MWh (CAD) (subject to inflationary adjustments) for power generated under the

agreement.

27.     In addition, Algoma (i) provides to EPC operating, maintenance and

administrative personnel as required by EPC at market prices; (ii) charges EPC for non-exclusive

use of and access to shared premises; and (iii) leases to EPC the premises on which the

cogeneration facility is located.

28.     Finally, Algoma's oxygen supply is provided by Praxair Canada Inc., an

unaffiliated third party supplier located at Algoma's facility.

### E.     Transportation of Goods and Products

29.     Algoma takes shipment of materials and delivers its steel products via rail, road,

and sea barges.  Many of its shipping arrangements are governed by contract, and others are

pursuant to open market transactions.  Due to Algoma's location, transporting material and

goods by railroad, particularly in the winter months when sea vessels cannot make deliveries, is vital to the company's operations.

30.     Algoma also needs access to the Port of Algoma, which is owned by an affiliate, Port of Algoma Inc. ("**PortCo**").  Algoma monetized the port pursuant to an arm's-length transaction effectuated as part of the 2014 Restructuring.  Specifically, Algoma sold certain port-related assets to PortCo for approximately $3.8 million (CAD), and leased the land underlying the port to PortCo for fifty (50) years, for a payment of $142.2 million (USD) cash ($148.5 million, less fees of $6.3 million) and a $19.8 million (USD) promissory note.  The note was assigned to and assumed by the parties' ultimate parent, EGFL (defined below).  The parties also entered into a cargo handling agreement and shared services agreement, pursuant to which Algoma pays for use of the port and provides PortCo with certain services for an annual net fee of $25 million (USD).

### III.     THE COMPANY'S CORPORATE STRUCTURE

31.     In 2007, Algoma (then operating under a different name) was acquired (the "**Acquisition**") by Essar Global Fund Limited ("**EGFL**"), a multinational Cayman Islands entity, with majority ownership in a number of world-class assets diversified across the energy, metals and mining, infrastructure, and services sectors.  EGFL and its portfolio companies have made several investments in Algoma, including an initial equity investment of $530 million as part of the Acquisition and an additional $300 million as part of the 2014 Restructuring.

32.     Algoma's primary operating entity is Algoma Canada.  Algoma Canada is incorporated pursuant to the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44.  Algoma Canada employs all of Algoma's Canadian employees, and owns all of Algoma's real property, steel manufacturing equipment, and other operating assets.  Algoma Canada is the borrower under the Prepetition Revolving ABL Facility and the Prepetition Term Loan Agreement, and the

issuer of the 9.5% Senior Secured Notes (each as defined below).  It also guaranteed the 14%

Junior Secured PIK Notes (as defined below).  Algoma Canada is party to numerous supply and

customer contracts, many of which are with U.S. counterparties and governed by U.S. law.

33.     As indicated in the corporate structure chart attached hereto as **Exhibit B**,

Algoma Holdings B.V. ("**Dutch Holdings**") and Essar Tech Algoma Inc. ("**BC Holdings**")

wholly own Algoma Canada.  Dutch Holdings is a Netherlands-incorporated corporation whose

ultimate parent is EGFL.  It is not a Debtor at this time in these chapter 15 cases and is not

subject to the CCAA Proceeding.

34.     BC Holdings is incorporated in British Columbia and its ultimate parent company

is EGFL.  It was formed in connection with the 2014 Restructuring.  BC Holdings has no

operations and no employees.  Its only liabilities are the guarantees it issued with respect to the

Prepetition Revolving ABL Facility, Prepetition Term Loan Agreement, 9.5% Senior Secured

Notes, and 14% Junior Secured PIK Notes, and it has no assets other than its direct and indirect

interests in its subsidiaries.

35.     Algoma Canada has several subsidiaries it wholly owns.  Essar Steel Algoma Inc.

USA ("**Algoma USA**") is a Delaware corporation that provides sale and marketing support for

the business and employs six U.S. sales employees, who work remotely from Illinois,

Pennsylvania, Minnesota, and New York.  It has no significant liabilities except the guarantees it

issued with respect to the Prepetition Revolving ABL Facility, Prepetition Term Loan

Agreement, 9.5% Senior Secured Notes, and 14% Junior Secured PIK Notes.

36.     Essar Steel Algoma (Alberta) ULC ("**Algoma Alberta**"), an Alberta unlimited

liability corporation, is another wholly-owned subsidiary of Algoma Canada.  It issued the 14%

Junior Secured PIK Notes and guaranteed the obligations under the Prepetition Revolving ABL

Facility, Prepetition Term Loan Agreement, and 9.5% Senior Secured Notes.  It is a non-operating company with no assets.

37.     Cannelton Iron Ore Company, a Delaware company, also is a wholly-owned subsidiary of Algoma Canada.  It is a non-operating company, has no assets, and has no liabilities except guarantees it issued with respect to the Prepetition Revolving ABL Facility, Prepetition Term Loan Agreement, 9.5% Senior Secured Notes, and 14% Junior Secured PIK Notes.

38.     Algoma Canada also has two non-Debtor affiliates – 2463819 Ontario Inc. and Essar Distribution and Transmission Inc. – each of which has no assets or liabilities.

## IV.     ALGOMA'S PREPETITION CAPITAL STRUCTURE

39.     As of the date hereof (the "**Commencement Date**"), Algoma has approximately $1.1 billion (USD) in debt outstanding.  This amount excludes accrued interest, fees and other amounts through the Commencement Date that may be triggered as a result of these filings, as well as pension, OPEB, and other liabilities.  Algoma's capital structure is a result of the 2014 Restructuring, pursuant to which Algoma's then-existing secured debt was refinanced and paid in full, and its unsecured notes were exchanged for a combination of cash and new junior secured notes (described below).

### A.     Prepetition Revolving ABL Facility

40.     On November 14, 2014, Algoma Canada, as borrower, and the other Debtors, as guarantors, entered into that certain revolving credit agreement (the "**Prepetition Revolving ABL Facility**," a copy of which is attached hereto as **Exhibit C**)[3] with Deutsche Bank AG (acting through its Canada branch), as administrative agent and collateral agent (the "**ABL**

---

[3] The schedules and exhibits for each of the prepetition credit facilities have not been included in the exhibits attached hereto; however, they will be made available upon request.

**Agent**"), providing the Debtors with a $50 million (USD) asset-based revolving credit facility, with sub-facilities for swingline loans of up to $5 million (USD) and letters of credit of up to $40 million (USD).  The loans under the Prepetition Revolving ABL Facility are available in either U.S. dollars or Canadian dollars.  Funds from the Prepetition Revolving ABL Facility are used for working capital and general corporate purposes.  Availability under the Prepetition Revolving ABL Facility was capped by a borrowing base, calculated based on certain percentages of the value of the borrower's inventory and receivables and subject to certain reserves and sub-limits. Borrowings under the Prepetition Revolving ABL Facility bore interest, at the option of the borrower, at either (i) a base rate or Canadian prime rate (as applicable based on the currency), or (ii) a LIBOR rate or Canadian CDOR rate (as applicable based on the currency) plus, in each case, an applicable margin ranging from 2.50%-3.00% for base rate or Canadian prime rate loans and 1.50%-2.00% for LIBOR rate or Canadian CDOR rate loans, in each case based on the amount of historical excess availability, as determined on a quarterly basis.  The Prepetition Revolving ABL Facility matures on May 17, 2019.  Accrued interest on the revolving loans are payable (i) in the case of base rate or Canadian prime rate loans, quarterly, and (ii) in the case of LIBOR rate or Canadian CDOR rate loans, on the last day of each interest period applicable thereto (but in no event less frequently than quarterly).  The guarantees provided by Dutch Holdings and BC Holdings are unsecured, and the guarantees provided by Algoma USA, Cannelton Iron Ore Company, and Algoma Alberta's are secured (the "**Secured Guarantors**").

41.     Obligations under the Prepetition Revolving ABL Facility are secured by (i) a first priority lien on substantially all accounts, cash, and inventory owned by the borrower and each Secured Guarantor, subject to certain exclusions (the "**ABL Priority Collateral**"), and (ii) a second priority lien on substantially all the stock, equipment, fixtures, intellectual property, real

estate, and other assets not constituting the ABL Priority Collateral owned by the borrower and each Secured Guarantor, subject to certain exclusions (the "**Term Loan Priority Collateral**").

42.     As of the Commencement Date, there was approximately $42.5 million (USD) in principal outstanding under the Prepetition Revolving ABL Facility and approximately $17 million (CAD) in letters of credit outstanding.

### B.    Prepetition Term Loan Agreement

43.     On November 14, 2014, Algoma Canada, as borrower, and the other Debtors, as guarantors, entered into that certain term loan credit agreement (the "**Prepetition Term Loan Agreement**," a copy of which is attached hereto as **Exhibit D**) with Deutsche Bank AG New York Branch, as administrative agent and collateral agent (the "**Term Loan Agent**"), providing for a $375 million (USD) senior secured term loan facility.  Funds from the Prepetition Term Loan Agreement were used (i) to finance the 2014 Restructuring and (ii) to pay fees and expenses incurred in connection with the 2014 Restructuring transactions.  The term loan bore interest, at the option of the borrower, at either (i) a LIBOR rate plus 6.50%, or (ii) base rate plus 5.50%.  The Prepetition Term Loan Agreement matures on August 16, 2019.  Accrued interest on the term loans is payable (i) in the case of LIBOR loans, on the last day of the interest date selected by the borrower (but in no event less frequently than quarterly), and (ii) in the case of base rate loans, quarterly.

44.     Obligations under the Prepetition Term Loan Agreement are secured by (i) a first priority lien on the Term Loan Priority Collateral (pari passu with the 9.5% Senior Secured Notes), and (ii) a second priority lien on the ABL Priority Collateral.

45.     As of the Commencement Date, there was approximately $371 million (USD) in principal outstanding under the Prepetition Term Loan Agreement, plus accrued interest.

### C.     9.5% Senior Secured Notes

46.     On November 14, 2014, Algoma Canada, as issuer, and the other Debtors, as guarantors, entered into an indenture with Wilmington Trust, National Association, as trustee and collateral agent (the "**Senior Notes Trustee**"), pursuant to which Algoma Canada issued $375 million (USD) in aggregate principal amount of 9.5% senior secured notes due November 15, 2019 (the "**9.5% Senior Secured Notes**") in a private offering exempt from registration under the Securities Act of 1933, as amended (the "**Securities Act**").[4]  The proceeds of the 9.5% Senior Secured Notes were used to finance the 2014 Restructuring.

47.     Obligations under the 9.5% Senior Secured Notes are secured by (i) a first priority lien on the Term Loan Priority Collateral, and (ii) a third priority lien on the ABL Priority Collateral.

48.     As of the Commencement Date, there was approximately $375 million (USD) in principal outstanding under the 9.5% Senior Secured Notes, plus accrued interest.

### D.     14% Junior Secured PIK Notes

49.     On November 14, 2014, Algoma Alberta, as issuer, and the other Debtors, as guarantors, entered into an indenture with Wilmington Trust, National Association, as trustee and collateral agent (the "**Junior Notes Trustee**"), pursuant to which Algoma Alberta issued $252,103,398 (USD) in aggregate principal amount of 14% junior secured notes due February 13, 2020, with interest payments to be made in cash or payment in kind, at Algoma Alberta's election (the "**14% Junior Secured PIK Notes**").[5]  The 14% Junior Secured PIK Notes were issued in reliance on the exemption from registration afforded by section 3(a)(10) of the Securities Act.  The 14% Junior Secured PIK Notes were issued in exchange for the Debtors'

---

[4] A copy of the indenture governing the 9.5% Senior Secured Notes is attached hereto as **Exhibit E**.

[5] A copy of the indenture governing the 914% Junior Secured PIK Notes is attached hereto as **Exhibit F**.

unsecured notes at the time of the 2014 Restructuring and the Debtors did not receive cash proceeds as a result of such issuance.

50.      Obligations under the 14% Junior Secured PIK Notes are secured by (i) a third priority lien on the Term Loan Priority Collateral, and (ii) a fourth priority lien on the ABL Priority Collateral.

51.      As of the Commencement Date, there was approximately $280 million (USD) in principal outstanding under the 14% Junior Secured PIK Notes.

### E.      Intercreditor Agreements

52.      The relative priorities of the liens held by the lenders for the Prepetition Revolving ABL Facility, the lenders for the Prepetition Term Loan Agreement, the holders of the 9.5% Senior Secured Notes, and the holders of the 14% Junior Secured PIK Notes, and restrictions on the ability to exercise remedies against collateral, are subject to that certain intercreditor agreement, dated as of November 14, 2014, among the Debtors, the ABL Agent, the Term Loan Agent, the Senior Notes Trustee, and the Junior Notes Trustee (the "**Intercreditor Agreement**," a copy of which is attached hereto as **Exhibit G**).  In accordance with the Intercreditor Agreement, the parties thereto agreed that, (i) with respect to liens on the ABL Priority Collateral, the Prepetition Revolving ABL Facility secured parties have first priority, the Prepetition Term Loan Agreement secured parties have second priority, the 9.5% Senior Secured Notes secured parties have third priority, and the 14% Junior Secured PIK Notes secured parties have fourth priority; and (ii) with respect to liens on the Term Loan Priority Collateral, the Prepetition Term Loan Agreement secured parties and the 9.5% Senior Secured Notes secured parties have first priority, the Prepetition Revolving ABL Facility secured parties have second priority, and the 14% Junior Secured PIK Notes secured parties have third priority.

53.     In addition, the Debtors, the Term Loan Agent, and the Senior Notes Trustee entered into that certain pari passu intercreditor agreement, dated as of November 14, 2014, which provides for the priority of claims and payments and restrictions on the ability to exercise remedies against shared Term Loan Priority Collateral as between the secured parties under the Prepetition Loan Agreement and the 9.5% Senior Secured Notes (the "**Pari Passu Intercreditor Agreement**," a copy of which is attached hereto as **Exhibit H**).

**V.     KEY EVENTS LEADING TO RESTRUCTURING**

**A.     Deteriorating Economic and Market Conditions Prior to 2014 Restructuring**

54.     As a company in the steel industry, Algoma has had a troubled financial history, having gone through and recovered from several market downturns.  After the economy fell in 2008 and 2009, Algoma once again experienced this cycle.  With the slowdown of growth in the construction and manufacturing sectors, steel production hit an all-time low in 2009, as did pricing for steel products.  As a result, Algoma recorded net losses of $396 million (CAD) and $305 million (CAD) for fiscal years 2010 and 2011, respectively, with EBITDA of $50 million (CAD) and $(21) million (CAD), respectively.  Although market conditions began to improve in 2013 and 2014, Algoma's operations and financial performance further suffered in 2014 due to an unprecedented and extremely cold winter season that caused Algoma to operate at reduced capacity.  In addition, above-market pricing associated with the Cliffs Iron Ore Contract significantly increased Algoma's operating costs, resulting in a negative impact to financial results.

55.     Algoma also was struggling to meet its pension obligations.  Algoma sponsors three defined benefit pension plans and one defined contribution pension plan.  Due to, among other factors, a historically low interest rate environment, as of November 2012 Algoma was

incurring pension obligations of approximately $2 million (CAD) per month for current service amounts and $6 million (CAD) per month for special payments.  As of August 1, 2012, the wind up deficit for the defined benefit pension plans was approximately $641 million (CAD).  As a result, in December 2013, Algoma sought and received relief from the Ontario Government.  The Government passed a regulation establishing a fixed payment schedule ("**Pension Payment Schedule**") through March 31, 2017, requiring Algoma to pay $55 million (CAD) in calendar years 2014 and 2015 ($4.6 million (CAD) monthly), $60 million (CAD) in calendar year 2016 ($5.0 million (CAD) monthly), and $5.0 million (CAD) monthly during calendar year 2017 ending with the month in which the valuation report for its pension plans is filed.  The Pension Payment Schedule lowered Algoma's annual cash outlays and extended the amount of time Algoma has to repay the shortfall, resulting in increased liquidity to the company starting in January 2014.

### B.       The 2014 Restructuring

56.      On July 16, 2014, Algoma Canada, Essar Steel Canada Inc. (an entity that has since amalgamated with Algoma Canada), Cannelton Iron Ore Company, Algoma USA, and Dutch Holdings (collectively, the "**Applicants**") commenced the CBCA Proceeding to effectuate an arrangement providing for a recapitalization of Algoma's capital structure, including the refinancing of Algoma's then-current credit agreements and senior secured notes.  Algoma Canada was appointed the foreign representative of the Applicants, and commenced cases under chapter 15 of the Bankruptcy Code with this Court.  This Court (i) found that the Applicants' center of main interests is in Canada and recognized the CBCA Proceeding as a foreign main proceeding, and (ii) provided Applicants with provisional relief through application of sections 362 and 365(e) of the Bankruptcy Code.  *In re Essar Steel Algoma Inc.*, No. 14-11730 (BLS)

(Bankr. D. Del. July 17, 2014) [D.I. 28] (order granting provisional relief); *In re Essar Steel Algoma Inc.*, No. 14-11730 (BLS) (Bankr. D. Del. Aug. 22, 2014) [D.I. 102] (order granting final relief).

57.     The 2014 Restructuring resulted in a reduction of Algoma's overall debt by approximately $145 million (USD) in principal, and a reduction in cash interest payments of over $47 million (USD) per year.  The restructuring left the company with approximately $1 billion (USD) of debt, annual cash interest payments of $65 million (USD), payment in kind (PIK) interest of $35 million (USD) annually, and approximately $40 million (USD) of cash.

58.     This debt reduction was implemented as a compliment to certain operating issues Algoma was in the process of resolving, including with respect to its iron ore supply.  In 2013, Algoma renegotiated the Cliffs Iron Ore Contract to address issues related to market price dynamics and to extend the supply agreement with Cliffs to 2024.  Pricing in the original Cliffs agreement was significantly above market, which negatively affected Algoma's financial results. Further, the agreement included an exclusivity clause that prevented Algoma from obtaining competitively priced iron ore from another supplier.  The renegotiated terms of the Cliffs Iron Ore Contract took effect beginning in mid-2013.  Pursuant to the amended contract, the pricing terms were revised to eventually provide for at or near market prices.  In addition, the term of the exclusivity clause expires on December 31, 2016.

### C.     Continued Decline of Steel Prices Causing Liquidity Constraints

59.     Immediately subsequent to the 2014 Restructuring, Algoma was performing well. EBITDA was positive, the company was able to satisfy its debt service obligations, and the steel market was improving.  Because of the improved market however, and because of the strengthening of the U.S. dollar, the North American steel market quickly became flooded with

imports from Asia and other regions.  This trend began in October/November of 2014, and had

significantly advanced by January 2015.  With an oversupplied market, as demonstrated in the

graph below, pricing for steel fell precipitously.  Algoma's EBITDA began to sink and the

company began to experience significantly strained liquidity.

Hot Rolled Coil & Plate Pricing:  Last Two Years[6]



### D.    Cliffs Dispute

60.    At the same time, Algoma became party to a litigation with Cliffs.  In January

2015, Cliffs commenced a lawsuit in the U.S. District Court for the Northern District of Ohio

seeking damages against Algoma for alleged breach of contract and for a declaratory judgment

(the "**Ohio Litigation**").  Cliffs claimed that Algoma breached the Cliffs Iron Ore Contract by

failing to take delivery of and pay for a portion of the nominated tonnage of pellets that Cliffs

alleges Algoma was obligated to purchase in 2013 and 2014, and that Algoma breached certain

confidentiality provisions in the agreement.  Cliffs also sought a ruling that it was not required to

---

[6] American Metals Market, Steel First

pay to Algoma certain substantial credit payments as required by the 2013 extension. In response, Algoma refuted the allegations and asserted certain defenses and counterclaims, including with respect to Cliffs' purposeful delay and/or withholding of shipments to Algoma, Cliffs' refusal to pay the credit payments owed to Algoma pursuant to the agreement, Cliffs' refusal to honor an agreement to reduce the 2014 nomination and appropriately charge Algoma for iron ore supplied in 2015, Cliffs' inaccurate reporting of moisture levels in delivered pellets, and Cliffs' breach of the agreement's confidentiality provisions.

61.     While this litigation was pending, Cliffs continued to supply Algoma with, and Algoma paid for, iron ore pellets. Then suddenly, on October 5, 2015, without any advance notice, and without basis in the law or contract, Algoma received a letter from Cliffs announcing that Cliffs was treating the Cliffs Iron Ore Agreement as terminated, effective immediately. Cliffs immediately ceased providing Algoma with this essential raw material. Algoma disputes that Cliffs had any basis to terminate the agreement, including because there is no termination provision in the Cliffs Iron Ore Contract that would permit Cliffs to take such action. Cliffs unilaterally cut off Algoma's exclusive supply of the key item it requires to produce steel, and Cliffs did so at the exact moment that the price per gross ton of iron ore pellets under the Cliffs Iron Ore Agreement finally reduced to market levels. There is no pending litigation regarding Cliffs' wrongful termination as part of the Ohio Litigation.

62.     All of this came at a critical time for Algoma, at the precipice of the winter season, during which time it becomes exceedingly difficult to receive deliveries of iron ore pellets. The nearby waterways generally are frozen January through March, making delivery by sea vessel impossible. In the normal course of business, Algoma would stockpile a large amount of iron ore pellets so that, by the end of December, it had a substantial portion of the supply

necessary for production during the winter months.  The remaining portion historically was provided by Cliffs, who is one of the few suppliers capable of delivering pellets via rail to Algoma during the winter.  Algoma needed to act quickly to secure this supply.

63.     Because of the parties' longstanding relationship and because it is not easy from a logistical standpoint to swap in a new supplier (especially after relying on the same one for decades), Algoma attempted to negotiate terms under which Cliffs would be willing to continue supplying iron ore pellets pending resolution of the dispute.  Taking advantage of Algoma's tenuous situation, Cliffs demanded an exorbitant price that was well above market.

64.     Algoma simply could not afford to fund its seasonal buildup at the cost Cliffs proposed.  Accordingly, Algoma commenced an action for a temporary restraining order and preliminary injunction in the Ohio Litigation, to compel Cliffs to continue supplying material.  In the meantime, Algoma was forced to explore alternate suppliers.  Eventually, Algoma was able to reach short-term agreements with two suppliers, and therefore withdrew its request for injunctive relief in the Ohio Litigation.  Significant questions remain, however, as to where Algoma will receive its iron pellet supply going forward, on a long-term basis.[7]

65.     In the wake of these obstacles, Algoma has made substantial efforts to reduce costs, manage cash, and conserve its iron ore pellet supply.  Algoma has continued to cut expenses, it laid off approximately 100 employees, and it reduced production to 60-65% of operating level.  Functioning at a reduced capacity, however, is not sustainable and is not a viable long-term strategy to resolve Algoma's financial performance issues.  Furthermore, Cliffs publicized the parties' dispute, causing significant collateral damage with Algoma's customers, other suppliers, and creditors.

---

[7] The Foreign Representative intends to file one or more pleadings relating to Cliffs' performance under the Cliffs Iron Ore Contract.  In addition, in the CCAA Proceeding, Algoma intends to seek "critical supplier relief" with respect to Cliffs, pursuant to which Cliffs would be compelled to continue supplying Algoma on commercial terms.

66.    On October 20, 2015, Algoma delivered to the Term Loan Agent notice of the occurrence of an event of default under the Prepetition Term Loan Agreement relating to a breach of a financial covenant with respect to the fiscal quarter ending September 30, 2015, resulting from a gap in the borrowing base.  Although Algoma also notified the Term Loan Agent of its intent to exercise its cure right with respect to this financial covenant, Algoma could not secure funding in time to resolve this issue before reaching a liquidity crisis and an emergency with respect to its iron ore supply level.  The best financing available would be pursuant to a debtor-in-possession facility implemented as part of an insolvency proceeding.

67.    On behalf of the Debtors, Evercore began a process in early October 2015 to source debtor-in-possession financing ("**DIP Financing**") to (i) provide the Debtors with sufficient liquidity to maintain their operations, including the payment of employees and vendors, and (ii) fund an orderly CCAA Proceeding and these chapter 15 cases.  Evercore included in its process a wide variety of potential lenders, including, among others:  (a) two groups of lenders within the existing prepetition capital structure; (b) Algoma's ultimate parent entity; and (c) approximately 14 other financial institutions ("**Third Party Lenders**") experienced in distressed lending and debtor-in-possession financings.  Evercore requested proposals for a postpetition financing facility.  In response to such requests for proposals, seven parties signed non-disclosure agreements (others already were party to confidentiality agreements) and 11 were sent diligence materials for their review.

68.    The Debtors and Evercore had numerous discussions with these potential lenders and ultimately received five term sheet proposals for the financing.  One proposal was received from Deutsche Bank (acting as ABL Agent and Term Loan Agent for certain of lenders under the Prepetition Revolving ABL Facility and the Prepetition Term Loan Agreement), another

proposal was from an ad hoc group of holders of Algoma's outstanding notes, and three

proposals were from Third Party Lenders.  Each of the proposals was analyzed in detail by

Algoma and its Restructuring Advisors, and Algoma determined it was in its best interests to

simultaneously pursue negotiations with Deutsche Bank and the ad hoc group of noteholders in

order to maintain a competitive process and obtain the best available terms.

69.     Over a period of almost three weeks, Algoma and its Restructuring Advisors

engaged in intensive negotiations to obtain the best possible financing terms.  These negotiations

were arm's length at all times and may be characterized as hard bargaining by all interested

parties.  Over the course of the negotiations, Evercore and the other Restructuring Advisors made

presentations to Algoma's Board of Directors and its counsel that analyzed the details of the

competitive proposals, answered numerous questions posed by the members of the Board of

Directors, and made various observations and recommendations concerning the strengths and

weaknesses of each proposal.  Negotiations with the two potential groups of lenders continued

all the way up to the night before the commencement of these chapter 15 cases, with the lenders

agreeing to additional concessions to improve their proposals.  Ultimately, the Board of

Directors approved the Deutsche Bank proposal.

70.     Algoma entered into superpriority senior secured, priming, non-amortizing,

debtor-in-possession term loan credit facility in an aggregate principal amount of $175.0 million

(USD), and a superpriority senior secured, priming, non-amortizing, debtor-in-possession

revolving credit facility in an aggregate principal amount of $25.0 million (USD) (collectively,

the "**DIP Facility**"), to be evidenced by that certain Senior Secured, Priming, and Superpriority

Debtor-In-Possession Revolving Credit Agreement with Deutsche Bank dated as of November 9,

26

2015 for an initial availability of $25 million (USD)[8] under a revolving credit facility and a term sheet attached thereto, as may be amended and restated from time to time (the "**DIP Credit Agreement**," a copy of which is attached hereto as **Exhibit I**).  The DIP Credit Agreement provides that Deutsche Bank is committed to provide the full amount of the DIP Facility and Algoma and Deutsche Bank are obligated to negotiate in good faith to amend and restate the DIP Credit Agreement to provide for the terms set forth in the term sheet attached to the DIP Credit Agreement.  The term sheet contemplates the full $200 million (USD) DIP Facility will be evidenced by that certain secured debtor-in-possession credit agreement to be entered into by and among Algoma Canada, as borrower, Algoma USA, Cannelton Iron Ore Company, and Essar Steel Algoma (Alberta) ULC as guarantors (the "**Guarantors**"), the DIP Lenders, and Deutsche Bank, or an affiliate, as administrative agent and collateral agent for the DIP Lenders (in such capacity and together with its successors, the "**DIP Agent**") (together with the Exhibits and Schedules annexed thereto, the "**DIP Loan Agreement**").  The Debtors advised the other potential lenders of its decision.

71.     The salient terms of the DIP Financing are summarized below:[9]

| a) Borrower | Essar Steel Algoma Inc., a Canadian corporation |
|---|---|
| b) Guarantors | Essar Steel Algoma Inc. USA, Cannelton Iron Ore Company, Essar Tech Algoma Inc., Essar Steel Algoma (Alberta) ULC and each other entity that guaranteed, or is required to guarantee, the obligations under the Prepetition ABL Credit Agreement and the Prepetition Term Credit Agreement. [10] |

---

[8] The DIP Credit Agreement currently reflects an initial $25 million (USD) revolving loan but the DIP Lenders agreed to provide a $50 million (USD) term loan and the DIP Credit Agreement will be amended to reflect this change.

[9] Capitalized terms used in this summary of the DIP Facility that are not defined herein have the meanings set forth in the DIP Credit Agreement.  This summary of the DIP Facility is a summary and is not intended to be a complete recitation of the terms of the DIP Facility and  shall not be deemed to modify or govern the terms of the DIP Facility in any way.

[10] Algoma Holdings B.V. will not be a guarantor upon the Initial Availability.  Algoma is seeking to obtain the necessary approvals for them to become guarantors prior to the Comeback Availability.

| | | |
|---|---|---|
| c) | Lenders | Deutsche Bank and a syndicate of banks, financial institutions and other institutional lenders acceptable to the DIP Agent, including without limitation, certain of the lenders under the Prepetition Term Credit Agreement and Prepetition ABL Credit Agreement |
| d) | DIP Agent | Deutsche Bank AG New York Branch |
| e) | DIP Facility | A senior secured, priming, superpriority non-amortizing revolving credit facility (the "**Revolving Credit Facility**") in an amount of up to US$25 million, and a senior secured, priming, superpriority non-amortizing term loan facility (the "**Term Loan Facility**" and, together with the Revolving Credit Facility, collectively, the "**DIP Facilities**") in an amount of up to US$175 million made available to the Borrower pursuant to three (3) drawings during the period from the Closing Date until the Maturity Date (each as defined below). |
| f) | Availability | (1) $25 million revolving loan following entry of the CCAA Initial Order and entry of the Provisional Relief Order and satisfaction of certain other conditions (the "**Initial Availability**"), (2) $50 million term loan following amendment and restatement of initial Credit Agreement and satisfaction of certain other conditions, (which amount shall be used to repay the initial $25 million borrowed on the revolving loan), (3) an additional $75 million term loan upon satisfaction of certain conditions precedent (the "**Comeback Availability**"), and (4) the remaining undrawn amount up to $200 million under a $175 million Term Loan Facility and $25 million Revolving Loan Facility upon satisfaction of certain conditions precedent (the "**Final Availability**").  In respect of the Revolving Credit Facility, the availability shall be limited by the amount of the Borrowing Base and amounts outstanding under the prepetition ABL Credit Agreement.<br><br>The conditions precedent to each availability amount are set forth below. |
| g) | Use of Proceeds | The DIP Facilities are being extended to the Debtors in order to provide the Debtors with sufficient time and liquidity to consummate a plan and the sale process, in each case on the terms and conditions expressly set forth in the DIP Facility.<br><br>The proceeds of the DIP Loans shall be used solely for the purposes set forth in the Budget including, without limitation, (i) for working capital and other general corporate purposes (and with respect to pension payments, only normal cost payments under Loan Parties' pension plans) of Algoma in accordance with, and subject to the limitations set forth in, the Budget, the CCAA Initial Order, the provisional relief order and the recognition order in the Chapter 15 Cases and (ii) to pay transaction costs, fees and expenses (including professional fees) incurred in connection with the DIP Facilities, the CCAA Proceedings, the Chapter 15 Cases and the transactions contemplated thereunder.<br>Subject to the Budget Variances, the expenditures authorized in the Budget shall be adhered to on a 4-week basis and on a cumulative basis as described below; provided, however, that unused expenditures shall carry forward to successive 4-week Budget periods on a cumulative basis. The Budget shall be tested on |

| | | |
|---|---|---|
| | | cumulative basis for a 4-week period then ended.  Actual amounts of the Borrower's expenditures may not vary from the applicable Budget period by more than 15% for each 4-week period during any Budget on a cumulative basis (excluding professional fees) (the "**Budget Variances**"). |
| h) | Interest and Fees | At the option of the Borrower, initially, Adjusted LIBOR (subject to a 1.00% floor in the case of the Term Loans) plus 9.00% or ABR plus 8.00%.  With respect to overdue principal the applicable interest rate plus 2.00% per annum, and with respect to any other overdue amount (including overdue interest), the interest rate applicable to base rate loans plus 2.00% per annum and in each case, shall be payable on demand.<br><br>The Borrower shall also pay certain fees as set forth in the DIP Credit Agreement. |
| i) | Term | The period from the Closing Date to the earliest of (i) June 30, 2016 (subject to extension), (ii) the first day on which a plan sanctioned by the CCAA Court has become effective and is binding upon all U.S. creditors pursuant to final order of the Bankruptcy Court, (iii) the consummation of a sale of all or substantially all of the assets of the Debtors approved by the CCAA Court and recognized by the Bankruptcy Court, (iv) the date that is 10 business days after the date of entry of the CCAA Initial Order if the Conditions to Comeback Availability have not been satisfied by such date, (v) the date that is 30 days after the date of entry of the CCAA Initial Order if the conditions precedent to Final Availability set forth in clause (i) thereof have not been satisfied by such date, (vi) the date that is 90 days after the date of entry of the CCAA Initial Order if the conditions precedent to Final Availability have not been satisfied by such date, and (vii) the date of termination of the DIP Lenders' commitments and the acceleration of the DIP Loans, in each case, under the DIP Facilities in accordance with the terms of the Loan Documents (the "**Maturity Date**"). |
| j) | Security and Priority | All amounts owing under the DIP Facilities are secured by a priority CCAA Court ordered charge on, and perfected security interest in all assets and property of the Debtors (collectively, the "**DIP Collateral**"; and any and all such charges, liens and security interests contemplated by the foregoing, collectively, the "**DIP Liens**"), including, without limitation, any claims and the proceeds of causes of action of the Debtors, subject only to Permitted Encumbrances.<br>"Permitted Encumbrances" means the Administration Charge, the Critical Supplier Charge and any person with a property perfected purchase money security interest under *Personal Property Security Act (*Ontario), statutory superpriority deemed trusts and liens for unpaid employee source deductions and any charge over the real property of the Debtors pursuant to section 11.8(8) of the CCAA.<br>All amounts owing under the DIP Facilities at all times shall rank ahead in priority to all other security interests, trusts, liens, charges and encumbrances, statutory or otherwise, in favor of any person, notwithstanding the order of perfection or attachment, including without limitation any lien or deemed trust created under the Ontario Pension Benefits Act, in favor of any person other |

| | | than Permitted Encumbrances. |
|---|---|---|
| k) | Events of Default | Each of the following shall constitute an event of default (each an "**Event of Default**"): (i) failure to pay principal, interest or fees when due; (ii) beach of any covenant or representations; (iii) termination of the CCAA Proceedings or the stay thereunder or conversion to proceedings under the *Bankruptcy and Insolvency Act (Canada)*; (iv) entry of an order granting any super-priority claim or lien which is senior to or *pari passu* with the DIP Lenders' claims or liens under the DIP Facilities other than Permitted Encumbrances without required consent; (v) entry of an order sanctioning (or the filing of any motion or pleading requesting sanction of) a plan that does not require (1) indefeasible repayment in full of the Prepetition Senior Facilities unless agreed to by the DIP Agent, DIP Lenders and Prepetition Lenders, (2) the payment in full in cash and termination of commitments under the DIP Facility and (3) certain releases provided to the DIP Agent, Prepetition Agent, DIP Lenders and Prepetition Lenders; (vi) entry of any order amending or varying the CCAA Initial Order, the Provisional Relief Order or the Recognition Order, each not reasonably acceptable to the DIP Agent or the DIP Lenders; (vii) payment of prepetition debt (other than as approved by the CCAA Court or as otherwise contemplated by the Loan Documents); (viii) cessation of liens or super-priority claims granted with respect to the DIP Facilities, including without limitation the DIP Liens, to be valid, perfected and enforceable in all respects with the priority described herein; (ix) failure to meet/achieve any Milestone; (x) failure to comply with the Budget Variances; (xi) the appointment of a receiver and manager, receiver, interim receiver, trustee in bankruptcy or similar official in respect of the Debtors; (xii) the CCAA Court or the Bankruptcy Court shall enter an order granting relief from the stay of proceedings to a creditor or party in interest (other than the DIP Agent as contemplated herein) to permit foreclosure (or the granting of a deed or lieu of foreclosure or the like) on any assets of the Debtors which have an aggregate value in excess of $250,000 without the consent of the DIP Agent; (xiii) the issuance of any order adversely impacting the right and interest of the DIP Agent or the DIP Lenders or the rights hereunder of the Prepetition Lenders, without the required consents; (xiv) post-petition judgments subject to a basket to be mutually agreed upon; (xv) actual or asserted (by any Loan Party or any affiliate thereof) invalidity or impairment of any Loan Document (including the failure of any lien to remain perfected); (xvi) the Borrower gives notice of an intention to wind-up any defined benefit plan, is ordered to wind up such plan or winds up any such plan; (xvii) the failure of any party to the Port Agreements or the Cogen Agreements to perform their respective obligations thereunder which would have a material adverse effect on the financial condition or operation of the Borrower; (xviii) termination of the Port Agreements or the Cogen Agreements; (xix) the CCAA Initial Order shall cease to be in full force and effect; (xx) Supportive Actions; (xxi) failure to comply with covenants; (xxii) cross-defaults; (xxiii) change of control; (xxiv) commencement of or conversion to a case under chapter 7 or 11 of the Bankruptcy Code; or (xxv) noncompliance with the terms of the CCAA Initial Order, the Provisional Relief Order or the Recognition Order. |

| | | |
|---|---|---|
| l) | Conditions Precedent | The Initial Availability of the DIP Loans under the DIP Facilities shall be subject to the following conditions precedent:  (i) the execution of documentation of the terms of the DIP Facility; (ii) the Debtors shall have commenced the CCAA Proceedings in the CCAA Court and the chapter 15 cases in the Bankruptcy Court; (iii) the CCAA Court shall have entered the CCAA Initial Order in form and substance satisfactory to the DIP Agent and the DIP Lenders authorizing and approving, among other things, the DIP Facilities and the advances thereunder up to the Initial Availability, and the granting of the DIP Liens with the priority contemplated herein; (iv) the Bankruptcy Court shall have entered the Provisional Relief Order in form and substance satisfactory to the DIP Agent and the DIP Lenders, among other things, recognizing the CCAA Initial Order; (v) the CCAA Initial Order and the Provisional Relief Order shall be in full force and effect and shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Agent and Requisite Revolving DIP Lenders; (vi) the DIP Agent shall have received an updated Budget, in form and substance satisfactory to the DIP Agent, including as to all assumptions; (vii) issuance of an order in the CCAA Court, in form and substance satisfactory to the DIP Agent and Requisite Revolving DIP Lenders, lifting the stay of proceedings to permit the Prepetition Term Loan Agent to commence a bankruptcy application against the Borrower.<br><br>The Interim Availability shall be conditioned on the satisfaction of the following: (i) the execution and delivery of the amended and restated loan documents with respect to the funding of the Interim Availability under the DIP Facilities, consistent with the terms hereof and in form and substance satisfactory to the DIP Agent and the DIP Lenders; (ii) the Initial Order and the Provisional Relief Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Agent and the Requisite DIP Lenders; (iii) the DIP Agent shall have received an updated Budget, in form and substance satisfactory to the DIP Agent and the Requisite DIP Lenders; (iv) delivery of a Borrowing Base Certificate; (v) all motions and other documents to be filed with and submitted to the CCAA Court and the Bankruptcy Court in connection with the DIP Facilities and the approval thereof shall be in form and substance satisfactory to the DIP Agent and the Requisite DIP Lenders, and all other orders entered by the CCAA Court and the Bankruptcy Court shall be in form and substance reasonably satisfactory to the DIP Agent and the Requisite DIP Lenders; (vi) all fees and expenses (including fees and expenses of counsel) required to be paid to the DIP Agent and the DIP Lenders on or before the Interim Availability Date shall have been paid; (vii) payment in cash of all fees and expenses of the Prepetition Lenders and the Prepetition Agents that had accrued prior to and including the Commencement Date (including, without limitation, fees and expenses related to the Prepetition Senior Facilities, this Term Sheet, the DIP Facilities and the filing of the Initial |

Order and the Provisional Relief Order), including the fees and expenses of White & Case LLP, Osler, Hoskin & Harcourt LLP, Davis Polk & Wardwell LLP and PricewaterhouseCoopers LLP; (viii) each DIP Lender who has requested the same shall have received "know your customer" and similar information; (ix) execution and delivery of a Term Loan Blocked Account depositary agreement in form and substance reasonably satisfactory to the DIP Agent and the Requisite DIP Lenders; (x) repayment in full in cash of all Revolving Loans then outstanding substantially contemporaneously with the occurrence of the Interim Availability Date; (xi) all conditions precedent set forth under the heading "Conditions Precedent to Initial Availability" (including as to the form of the order lifting the stay in clause (vii) thereof) have been satisfied in form and substance acceptable to the DIP Lenders holding more than 75% of the Term Loan Commitments then in effect, notwithstanding any waiver or amendment of any such Condition Precedent to Initial Availability by the DIP Agent or the Revolving DIP Lenders on the Initial Availability Date; provided, that the condition set forth in paragraph (vii) of "Conditions Precedent to Initial Availability" shall not be waived or amended without the consent of 100% of the DIP Lenders under the Term Loan Facility.

The Comeback Availability shall be conditioned on the satisfaction of the following 10 business days after the CCAA Initial Order: (i) the execution of documentation of the terms of the DIP Facility; (ii) the CCAA Court shall have heard the comeback motion for the CCAA Initial Order and such order shall not have been amended, restated, supplemented or otherwise modified without the consent of the DIP Agent and the Requisite DIP Lenders, other than certain specified changes; (iii) the CCAA Initial order and the provisional Relief Order each shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Agent and the Requisite DIP Lenders; (iv) delivery of a borrowing base certificate; (v) all motions and other documents to be filed with and submitted to the CCAA Court and the Bankruptcy Court in connection with the DIP Facility and the approval thereof shall be in form and substance satisfactory to the DIP Agent and the Requisite DIP Lenders, and all other orders entered by the CCAA Court and the Bankruptcy Court shall be in form and substance reasonably satisfactory to the DIP Agent and the Requisite DIP Lenders; (vi) the payment of all fees and expenses required to be paid to the DIP Agent and Lenders; (vii) the DIP Agent shall have received an updated Budget; and (viii) delivery of protocols and procedures regarding intercompany claims and cash transfers satisfactory to the DIP Agent and Requisite DIP Lenders.

The Final Availability of the DIP Facility shall be conditioned upon satisfaction of the following conditions within 90 days of the Initial Order: (i) prior to the date that is 30 days after the CCAA Initial Order (a) the CCAA Initial Order shall be in full force and effect; (b) the Bankruptcy Court shall have issued the Recognition Order; (c) the CCAA Court and the Bankruptcy Court shall have

| | |
|---|---|
| | issued orders satisfactory to the DIP Agent and Requisite DIP Lenders approving the Final Availability and priority of the DIP Liens; (d) all appeal periods with respect to the CCAA Initial Order and the Recognition Order shall have expired and no appeal is pending; (ii) all necessary governmental and third party consents and approvals necessary in connection with the DIP Facilities and the transactions contemplated thereby shall have been obtained; (iii) receipt of a public rating for the DIP Facility and a public corporate and corporate family rating from S&P and Moody; (iv) receipt of a field exam and appraisal with respect to the assets included in the Borrowing Base; (v) delivery of a Borrowing Base certificate; and (vi) all fees of the DIP Agent and DIP Lenders have been paid. |
| m) Post-Petition Interest | The Borrower shall pay in cash to the Prepetition ABL Agent for the ratable benefit the Prepetition ABL Lenders under the Prepetition ABL Credit Agreement (x) on the Interim Availability Date, all interest and letter of credit, unused commitment and other fees that have accrued through the Commencement Date at the applicable non-default rate provided for under the Prepetition ABL Credit Agreement; and (y) monthly in arrears all interest and letter of credit, unused commitment and other fees that accrue on and after the Commencement Date at the non-default rate and on terms (other than provided herein) provided for under the Prepetition ABL Credit Agreement; provided that, the Borrower shall be permitted to capitalize and add to the unpaid principal amount of the loans outstanding thereunder, the portion of interest and fees that accrue on and after the Commencement Date at the default rate. |
| n) Milestones | The Debtors shall comply with the following milestones: |
| | (i) the Debtors shall file with the CCAA Court a motion, in form and substance reasonably satisfactory to the DIP Agent and the Requisite Lenders, seeking approval of bidding procedures to facilitate the conduct of the Marketing Process (described below) (the "**Bidding and Sale Procedures**") on or before January 4, 2016 (the "**Bidding and Sale Procedures Date**"); |
| | (ii) the Debtors shall obtain an order of the CCAA Court, in form and substance reasonably satisfactory to the DIP Agent and the Requisite Lenders, approving the Bidding and Sale Procedures on or before January 11, 2016; |
| | (iii) the Debtors shall obtain an order of the CCAA Court, in form and substance reasonably satisfactory to the DIP Agent and the Requisite Lenders, on or before May 1, 2016: (i) approving a sale or investment transaction pursuant to the Bidding and Sale Procedures (a "**Transaction**"); and (ii) authorizing the Debtors to make a distribution of sale or investment proceeds from the Transaction to (A) the DIP Agent and the DIP Lenders in an amount sufficient to pay in full in cash all of the obligations under the DIP Facilities and (B) the Prepetition Agents and the Prepetition Lenders in an amount sufficient to pay in full in cash all of the obligations under the Prepetition Senior Facilities ((A) and (B), collectively, the "**Distributions**"); and |
| | (iv) the Debtors shall consummate the Transaction and make the Distributions to the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders on or before the Scheduled Maturity Date (as extended by any |

Extension (as permitted by such definition above)).

The Debtors shall commence a "**Marketing Process**" pursuant to the Bidding and Sale Procedures seeking offers in respect of all or part of the Debtors' assets and property or investments in the Debtors' businesses, approved by an order of the CCAA Court, in form and substance acceptable to the DIP Agent, the Requisite Lenders and the Debtors in all respects, and which shall, at a minimum, include the following terms:

(i) the sale and investment solicitation process may be a public auction or a private sale process;

(ii) the sale and investment solicitation process will require that any bid contain a cash component sufficient to repay all amounts outstanding under the DIP Facilities;

(iii) the right of the Prepetition Agents (on behalf of the applicable Prepetition Lenders) and, at their option, the DIP Agent (on behalf of the DIP Lenders), to credit bid, whether as the stalking horse or otherwise (the "**Credit Bid**"), up to the full amount of their allowed claims under Prepetition Revolving ABL Credit Agreement, the Prepetition Term Loan Credit Agreement and the DIP Facilities, respectively, on terms and conditions satisfactory to (i) the Prepetition Agent with respect to a Credit Bid by the lenders under the Prepetition Revolving ABL Credit Agreement and the Prepetition Term Loan Credit Agreement, and (ii) the Requisite DIP Lenders with respect to a Credit Bid by the DIP Agent on behalf of the DIP Lenders, shall be fully preserved in all circumstances; and

(iv) to the extent the Prepetition Agents (on behalf of the applicable Prepetition Lenders) and the DIP Agent (on behalf of the DIP Lenders) act as a "stalking horse" in connection with Credit Bid, the Prepetition Agents, the Prepetition Lenders and the DIP Agent and the DIP Lenders shall be entitled in respect of the Credit Bid to the reimbursement of their reasonable expenses (the "**Expense Reimbursement**").

72.     Algoma needs to accomplish two key objectives to stabilize its business and position a platform for growth and value generation:  (1) deleverage its balance sheet; and (2) ensure that Algoma has an affordable and reliable source of iron ore pellets.  Algoma believes it will be able to achieve these goals in the CCAA Proceeding and these chapter 15 cases.  Unlike the situation in 2014, Algoma determined that commencing the CCAA Proceeding and these chapter 15 cases was the only viable alternative to protect the Company and its assets because the CCAA Proceeding and these chapter 15 cases provide a broad stay and critical creditor relief;

access to DIP Financing; the ability to coordinate between the CCAA Proceeding and these chapter 15 cases to resolve the iron ore pellet supply issue; and the tools to effect a comprehensive restructuring of Algoma's capital structure. This will position Algoma for positive financial performance in advance of an anticipated recovery of the steel market once supply levels stabilize and pricing rebounds.

73.     As detailed in the *Declaration of John Ciardullo in Support of Verified Chapter 15 Petitions and Motion of Foreign Representative for Entry of Provisional and Final Orders Granting Recognition of Foreign Main Proceeding* filed contemporaneously herewith, in the CCAA Proceeding, the Debtors' assets and affairs are subject to the supervision of the Canadian Court during the pendency of the CCAA Proceeding. Any party-in-interest seeking to object to the arrangement may appeal to the Canadian Court. The Canadian Court, through the CCAA Proceeding, is properly exercising its jurisdiction over the Debtors, as provided under the CCAA. Pursuant to the CCAA, the Debtors have obtained from the Canadian Court the CCAA Initial Order, in which the Canadian Court granted (among other things) a stay for the protection of all of the Debtors and their assets.

74.     On the date hereof, the Foreign Representative commenced these chapter 15 cases by filing, among other things, verified chapter 15 petitions seeking recognition by the Court of the CCAA Proceeding as a foreign main proceeding under chapter 15 of the Bankruptcy Code. While it is anticipated that the CCAA Proceeding will be the primary court-supervised restructuring of the Debtors, the Debtors require a recognition order under chapter 15 of the Bankruptcy Code and additional provisional and final relief to ensure that they are protected from creditor actions in the U.S., to ensure that contract counterparties continue to perform under

their agreements with Algoma, and to assist with the implementation of a CCAA plan of

arrangement or any other transaction to be completed pursuant to the CCAA Proceeding.

## VI.    REQUESTS FOR RECOGNITION AND RELATED RELIEF[11]

75.    In connection with the filing of these chapter 15 cases, Algoma has submitted the

Recognition and Relief Motion, the Joint Administration Motion, the Consolidated Lists Motion,

and the Notice Procedures Motion.  In addition to the facts set forth above, factual bases for

relief under each of these motions is set forth below.  I believe, after consultation with counsel,

that the relief requested by each of the motions is necessary to maximize value for all of the

Debtors' creditors through the CCAA Proceeding, protect the Debtors' assets in the U.S., and

properly administer these proceedings.

### A.    Recognition and Relief Motion

76.    Contemporaneously herewith, the Foreign Representative filed the Recognition

and Relief Motion seeking (a) entry of a provisional order (the "**Provisional Order**")

(i) recognizing and enforcing in the U.S., on an interim basis, the CCAA Initial Order, including,

without limitation, the Canadian Court's authorization of the DIP Facility and granting of a

charge and certain other protections (as described in more detail below), (ii) applying sections

362 and 365(e) of the Bankruptcy Code in these chapter 15 cases on an interim basis pursuant to

sections 1519(a)(3), 1521(a)(7), and 105(a) of the Bankruptcy Code, (iii) granting the DIP

Lenders certain protections afforded by section 364(e) of the Bankruptcy Code, and

(iv)  granting such other and further relief as the Court deems just and proper; and (b) a final

order (the "**Final Order**") after notice and a hearing (i) granting the petitions in these cases and

recognizing the CCAA Proceeding as a foreign main proceeding pursuant to section 1517 of the

---

[11] Capitalized terms used but not otherwise defined in this section have the meanings ascribed to them in the relevant First Day Pleadings.

Bankruptcy Code, (ii) giving full force and effect in the U.S. to the CCAA Initial Order, including any and all extensions or amendments thereof authorized by the Canadian Court and extending the protections of the Provisional Order to Algoma on a final basis, (iii) applying section 365 of the Bankruptcy Code in these chapter 15 cases on a final basis pursuant to section 1521 of the Bankruptcy Code, (iv) granting the DIP Lenders certain protections afforded by section 364(e) of the Bankruptcy Code, and (v) granting such other and further relief as this Court deems just and proper.

77.     As detailed more fully in the Memorandum of Law filed in support of the Recognition and Relief Motion, I believe there is a compelling case for recognition of the CCAA Proceeding as a foreign main proceeding.  I have been advised by counsel that the CCAA Proceeding is a "foreign proceeding" and that Algoma is a "foreign representative," as those terms are defined in the Bankruptcy Code.  I have been further advised that these cases were duly and properly commenced by filing the Petitions for Recognition accompanied by all fees, documents, and information required by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, including:  (a) corporate ownership statements; (b) a list containing (i) the names and addresses of all persons or bodies authorized to administer foreign proceedings of the Debtors, (ii) all parties to litigation pending in the U.S. in which the Debtors are a party at the time of the filing of the Petitions for Recognition, and (iii) all entities against whom provisional relief is being sought; (c) a statement identifying all foreign proceedings with respect to the Debtors that are known to the Foreign Representative; and (d) a copy of the CCAA Initial Order.

78.     I can attest that the CCAA Proceeding is pending in Canada and that Canada is the center of each of the Debtors' main interests.  As set forth above, (i) all corporate-level

decision-making and corporate administrative functions affecting the Debtors are centralized in Sault Ste. Marie, (ii) the Debtors' entire management team is based in Sault Ste. Marie, and (iii) primarily all of the Debtors' business operations are undertaken, and all of the Debtors' producing assets are located, entirely in Canada.

79.     I have been advised that, upon commencement of the CCAA Proceeding and entry of the CCAA Initial Order, all of Algoma's creditors were stayed from taking any enforcement actions against Algoma and its assets, wherever located.  Nonetheless, I believe there is a risk that certain of Algoma's creditors assert that they are not subject to the jurisdiction of the Canadian Court and may attempt to take enforcement actions in the U.S.  To protect against this risk, the Foreign Representative has filed the Recognition and Relief Motion seeking a final order (i) granting recognition of the CCAA Proceeding, (ii) giving full force and effect in the U.S. to the CCAA Initial Order, (iii) applying section 365 of the Bankruptcy Code to these chapter 15 cases, and (iv) granting the DIP Lenders certain protections required by them to make financing available to Algoma.  I have been advised that the entry of the Final Order granting the requested relief would, among other things, extend the protections of the stay to Algoma's assets located in the U.S, prevent contract counterparties from modifying or terminating U.S.-based contracts, and permit the enforcement in the U.S. of claims and liens granted to the DIP Lenders.

80.     I have been advised that the Court's recognition of the liens and charges negotiated in the DIP Facility approved by the Canadian Court in the CCAA Initial Order and the extension of the protections available under section 364(e) of the Bankruptcy Code to the DIP Lenders are necessary to allow Algoma access to the DIP Facility.  I believe that (i) the DIP Facility was negotiated at arm's length and in good faith, (ii) entry into the DIP Facility was a prudent exercise of prudent business judgment of Algoma's officers and directors and consistent

with their fiduciary duties, (iii) the DIP Facility is necessary and the terms and conditions of the

DIP Facility are fair, reasonable, and the best available under the circumstances, and (iv) the DIP

Facility is supported by reasonably equivalent value and consideration.  As a condition of the

DIP Facility, the DIP Lenders require entry of a provisional and final order of the Court that is

satisfactory to the DIP Lenders, which includes certain protections available under section 364(e)

of the Bankruptcy Code.  I can attest that without the ability to obtain DIP Financing, Algoma

would not have sufficient liquidity to maintain its operations and pursue its CCAA Proceeding

and chapter 15 cases.

       81.     I have been advised that application of section 365 is necessary to enable Algoma

to maintain key contracts, prevent counterparties from exercising insolvency-related termination

or modification provisions, and provide Algoma with the ability to assume or reject a contract or

compel a contract counterparty to perform under a contract.  This relief is particularly important

with respect to Cliffs, since it purported to terminate its iron ore supply contract with Algoma

with no basis for doing so, leaving Algoma with significant uncertainty regarding its ongoing

source of this essential raw material.  Additionally, more than half of Algoma's key suppliers are

entities with a presence in the U.S., many of whom are parties to contracts governed by U.S. law.

Approximately half of Algoma's customers are located in the U.S., many of whom are parties to

contracts governed by U.S. law.  I have been advised that Algoma's contract counterparties,

including those whose contracts are exclusively governed by U.S. law, are subject to the

jurisdiction of the Canadian Court and bound by the CCAA Initial Order.  Nevertheless, out of

an abundance of caution, and in order to fully protect its rights, Algoma seeks an order applying

section 365 of the Bankruptcy Code in these chapter 15 cases.  Algoma must have certainty that

Cliffs and other contract counterparties will not terminate or exercise remedies under their

agreements, will continue performing thereunder, and will be subject to and bound by any decision by Algoma to affirm or disclaim such agreements.  I can attest that, without the preservation of its contractual relationships, Algoma may lose the benefit of these agreements, litigation may ensue, and counterparties may obtain unfair advantages over other creditors.

82.     Counsel has advised me that the final relief requested in the Recognition and Relief Motion is not available until this Court grants the Final Order recognizing the CCAA Proceeding and that, in the interim, in these chapter 15 cases there is no automatic stay or other specific protections in the U.S. for Algoma's U.S. assets (other than the stay under the CCAA Initial Order).  In addition, absent access to the additional liquidity provided by Algoma's DIP Financing, it is likely that Algoma will be unable to meet its postpetition obligations as they become due, maintain the operation of its business as a going concern, or pursue restructuring efforts.  Therefore, in addition to the Final Order, Algoma is seeking on an interim basis, an order (i) recognizing the CCAA Proceeding, (ii) applying sections 362 and 365(e) to ensure that creditors do not attempt to bring any enforcement action against Algoma or attempt to terminate or modify their contracts as a result of the commencement of the CCAA Proceeding or these chapter 15 cases, and (iii) granting the DIP Lenders certain protections required by them to make financing available to Algoma, including protections under section 364(e) of the Bankruptcy Code.

83.     As noted above and in the Recognition and Relief Motion, Algoma has assets in the U.S., including valuable customer and supplier contracts governed by U.S. law.  In addition, each of the Debtors is either a primary obligor under or guarantor of Algoma's prepetition debt obligations, which are also governed by U.S. law.  I have been advised that unless the Provisional Order is granted and all creditors are enjoined, Algoma faces the risk that creditors

may take enforcement actions under Algoma's prepetition debt instruments to recover against its

U.S. assets, as well as the risk that contract counterparties, such as Cliffs, may attempt to

terminate or modify prepetition contracts governed by U.S. law.  I submit that if creditors

unilaterally pursue collection or enforcement efforts, such actions could diminish the value of

Algoma's assets and cause significant delay and disruption to Algoma's restructuring process.

Indeed, any such action by Cliffs, for example, could be crippling.  Without the protections

afforded by sections 362 and 365(e) of the Bankruptcy Code, the Debtors may lose valuable

rights and benefits thereunder.  Accordingly, I submit that the interim relief requested in the

Recognition and Relief Motion is necessary to protect against the disruption to business

operations and interference with reorganization efforts that would result from such attempted

exercise of remedies or cessation of performance by contract counterparties and others.

84.      Additionally, as described above, Algoma currently is operating under significant

liquidity constraints and requires immediate access to DIP Financing to fund working capital

requirements, capital expenditures, general corporate expenses, and the costs of administering its

bankruptcy cases.  The DIP Lenders have conditioned availability thereunder upon the Court's

provisional recognition of the DIP Facility and DIP Charge (as defined in the DIP Facility)

approved in the CCAA Initial Order in an order satisfactory to them, which includes certain

protections under section 364(e) of the Bankruptcy Code.  Without access to debtor-in-

possession financing, it is likely that Algoma will be unable to secure necessary goods and it is

possible that Algoma will lose customers and become unable to pay employees.  As a result,

Algoma may not be able to maintain the operation of its business as a going concern.

Accordingly, I submit that immediate access to DIP Financing is necessary to provide Algoma

with liquidity to operate during the CCAA Proceeding and these chapter 15 cases and to preserve

Algoma's business by providing assurance to its suppliers and customers that Algoma will be able to maintain its business operations and satisfy its obligations pending the outcome of these cases and the CCAA Proceeding.

85.      In contrast, I believe that Algoma's creditors and other stakeholders will suffer little, if any, harm as a result of the requested provisional relief as such relief will merely preserve the status quo and enable the Debtors to continue to finance their operations during the short time necessary for the Court to rule on the Petitions for Recognition.  In fact, I believe that granting the request for provisional relief will benefit Algoma's creditors and stakeholders because it will ensure that the value of Algoma's assets and business are preserved and maximized for the benefit of all stakeholders.

86.      Finally, as described in the Memorandum of Law and the Recognition and Relief Motion, and as discussed with counsel, I understand and believe that recognizing the CCAA Proceeding as a foreign main proceeding and granting the relief requested therein on a final basis is consistent with the purposes of chapter 15 of the Bankruptcy Code and U.S. public policy. Therefore, I believe that the provisional and final relief requested in the Recognition and Relief Motion is necessary and appropriate and is in the best interests of the Debtors, their creditors, and other parties in interest.

**B.      Joint Administration Motion**

87.      The Foreign Representative has also filed, contemporaneously herewith, the Joint Administration Motion seeking entry of an order directing joint administration of these chapter 15 cases for procedural purposes only, and providing that parties in interest shall use a consolidated caption to indicate that any pleading filed relates to the jointly administered chapter 15 cases.

88.     I believe that joint administration of these chapter 15 cases is warranted because Algoma's financial affairs and business operations are closely related and because it will ease the administrative burden of these cases on the Court and interested parties.  I can confirm that the Foreign Representative anticipates that the various notices, motions, hearings, orders, and other pleadings in these cases will affect all of the Debtors.  I believe that the Debtors are affiliates as Essar Tech Algoma Inc. owns or controls, either directly or indirectly, greater than twenty (20) percent of the outstanding voting securities of each of Essar Steel Algoma Inc., Essar Steel Algoma (Alberta) ULC, Cannelton Iron Ore Company and Essar Steel Algoma Inc. USA.  With five (5) affiliated Debtors, each with its own case docket, I believe that the failure to jointly administer these cases would result in numerous duplicative pleadings filed for each issue, served upon separate service lists.  I also believe that such duplication of substantially identical documents would be wasteful and would unnecessarily burden the Clerk of the Court (the "**Clerk**").

89.     Moreover, I have been advised that joint administration will permit the Clerk to use a single docket for all of the Debtors' cases and to combine notices to creditors and other parties in interest.  I have further been advised that joint administration will protect parties in interest by ensuring that they will be apprised of the various matters before the Court.  I believe that the proposed caption set forth in the Joint Administration Motion should be approved as the modified caption for these chapter 15 cases.

90.     I believe that the rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases inasmuch as the relief sought in the Joint Administration Motion is purely procedural and not intended to affect substantive rights.  I have been advised that each creditor and party in interest will maintain whatever rights it has

against the particular Debtor against which it allegedly has a claim or right.  I have also been

advised by counsel that the rights of all creditors will be enhanced by the reduction in costs

resulting from joint administration.  Finally, I have been advised that if the requested relief is

granted, the Clerk will be relieved of the burden of entering duplicative orders and keeping

duplicative files, and supervision of the administrative aspects of these cases by the Office of the

U.S. Trustee for the District of Delaware will be simplified.

91.     Therefore, I believe that the relief requested in the Joint Administration Motion is

necessary and appropriate and is in the best interests of the Court, the Debtors, their creditors,

and other parties in interest.

### C.     Consolidated Lists Motion

92.     The Foreign Representative has also filed, contemporaneously herewith, the

Consolidated Lists Motion seeking the entry of an order authorizing the Foreign Representative

to file a consolidated list identifying the names and addresses of the authorized foreign

administrators of Algoma, parties to litigation pending in the U.S. involving any of the Algoma

entities, and all persons and entities against whom the Foreign Representative seeks provisional

relief pursuant to section 1519 of the Bankruptcy Code.

93.     I can confirm that Algoma presently maintains various computerized lists that

contain the data required to comply with the requirements of Bankruptcy Rule 1007(a)(4).  I, on

behalf of the Foreign Representative, believe that the information, as maintained in the Algoma's

computer files (or those of its agents), may be consolidated and utilized efficiently to provide

interested parties with the information required by Bankruptcy Rule 1007(a)(4).  I, on behalf of

the Foreign Representative, submit that the filing of a consolidated Bankruptcy Rule 1007(a)(4)

list serves the interests of efficiency and will conserve the resources of all parties in interest,

including the Court.

94.     Therefore, I believe that the relief requested in the Consolidated Lists Motion is necessary and appropriate and is in the best interests of the Court, the Debtors, their creditors, and other parties in interest.

### D.     Notice Procedures Motion

95.     The Foreign Representative has also filed the Notice Procedures Motion seeking the entry of an order approving (a) the form of notice (the "**Recognition Hearing Notice**") of (i) the chapter 15 petitions and the Recognition and Relief Motion, (ii) the entry of the Provisional Order, (iii) the deadline to object to the proposed Final Order, and (iv) the hearing for the Court to consider the chapter 15 petitions and the relief requested in the Recognition and Relief Motion on a final basis (the "**Recognition Hearing**"); (b) the manner of service of the Recognition Hearing Notice; and (c) the manner of service on the Master Service List of any pleadings filed in these chapter 15 cases.

96.     I can attest that Algoma has hundreds of creditors, potential creditors, and other parties in interest, all of whom need to be provided with, among other things, notice of the Provisional Order, the proposed Final Order, the Recognition Objection Deadline, and the Recognition Hearing.  Under the facts and circumstances of the Debtors' chapter 15 cases, I submit that service of the Recognition Hearing Notice in the manner proposed in the Notice Procedures Motion will provide those parties identified as the Notice Parties in the Notice Procedures Motion with due and sufficient notice of the relief requested in the Recognition and Relief Motion and associated objection deadline and hearing dates.

97.     Furthermore, I believe that the Recognition Hearing Notice provides multiple efficient ways for any party receiving such notice to obtain copies of pleadings filed in these chapter 15 cases, as it provides the website of Algoma's notice and claims agent where copies of the pleadings, including the Recognition and Relief Motion, the Provisional Order, the CCAA

Initial Order, and the proposed Final Order will be available free of charge.  Additionally, I believe that service by the Foreign Representative of all pleadings that it files in these cases by U.S. or Canadian mail, first class postage prepaid, on the Master Service List is an efficient and effective way to provide notice to such key parties in these cases and the CCAA Proceeding.  At the same time, I believe that it will not overburden the Foreign Representative with the significant costs associated with copying and mailing all the various documents filed in these cases to the entire matrix of putative creditors and other parties.

98.     Therefore, I believe that the relief requested in the Notice Procedures Motion is necessary and appropriate and is in the best interests of the Court, the Debtors, their creditors, and other parties in interest.

## Conclusion

99.     Based on the foregoing, I believe that the relief being requested at the outset of these chapter 15 cases is well justified, necessary under the circumstances, in the best interests of the Debtors and their creditors, and should be granted.

100.     I certify pursuant to 28 U.S.C. § 1746 under penalty of perjury under the laws of the U.S. that the foregoing is true and correct to the best of my knowledge, information, and belief, and that the copy of the CCAA Initial Order attached hereto as **Exhibit A** is a true and correct copy of the same as entered by the Canadian Court.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct to the best of my information and belief.

Dated: November _9_, 2015

By:
Name:    J. Robert Sandoval
Title:     General Counsel of
            Essar Steel Algoma Inc.